# United States Court of Appeals
## For the First Circuit

No. 04-2495

UNITED STATES OF AMERICA,

Appellee,

v.

RAFAEL MORALES-RODRÍGUEZ

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Torruella, Circuit Judge,
Hansen,[*] Senior Circuit Judge,
and Lynch, Circuit Judge.

Erick E. Kolthoff Benners, on brief for appellant.
German A. Rieckehoff, Assistant United States Attorney, with
whom Nelson Pérez-Sosa, Assistant United States Attorney, and H.S.
García, United States Attorney, on brief for appellee.

July 21, 2006

---

[*]  Of the Eighth Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**.  On August 12, 2003, Rafael Morales-Rodríguez ("Morales" or "defendant") was charged in the United States District Court for the District of Puerto Rico in a fourteen-count indictment.  He was accused of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371 (Count One); mail fraud, in violation of 18 U.S.C. § 1341 (Counts Two through Ten); embezzlement of labor union funds, in violation of 29 U.S.C. § 501 (c) (Counts Eleven and Twelve); structuring money transactions, in violation of 31 U.S.C. §§ 5322(b) and 5324(3) and 18 U.S.C. § 2 (Count Thirteen); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Fourteen).

On May 12, 2004, after a six-day jury trial, Morales was found guilty of all charges except for Count Two.  On September 23, he filed a motion requesting a new trial, but this was denied.  He was sentenced to imprisonment for a term of 121 months as to Counts Three through Ten, and Counts Thirteen and Fourteen.  He was sentenced to a term of five years as to Counts One, Eleven, and Twelve.  All sentences were to be served concurrently.  Additionally, the district court imposed a supervised release condition requiring Morales to submit to a drug test within fifteen days of release and thereafter to random drug testing not to exceed 104 samples per year.  On October 4, 2004, Morales filed this appeal, challenging both his convictions and his sentence.  After careful consideration, we affirm.

# I.  Facts

From 1992 to 2003, Morales was Vice-President of Frente Unido de Policías Organizados ("FUPO"), and  José De Jesús-Serrano ("De Jesús") was FUPO's President.  FUPO was a not-for-profit organization open to police officers and security guards, whose goal was to offer better working conditions and salaries for its members, as well as to provide legal representation in civil and criminal cases against its members.

Through various outreach efforts including promotional materials sent by mail, FUPO made constant efforts to recruit new members.  New members filled out forms to authorize the payment of FUPO membership fees through automatic deductions from their salaries.  Members either personally delivered these forms to FUPO's offices or sent them by mail.  Once FUPO was in possession of a new member form, a letter signed by either Morales or De Jesús would be sent by mail to the relevant agencies and municipalities, authorizing the deduction of FUPO membership fees from the new member's salary.  Once deducted, membership fees were sent to FUPO by mail.  FUPO received some fifty checks for membership fees each month by mail, and all checks were handled personally by Morales or De Jesús.  Membership cards that were not picked up at FUPO's offices were sent by mail.  In the years 2002 and 2003, FUPO's membership reached approximately 18,000.

Around the year 2000, members began to complain that promised services and benefits were not being delivered. One of the ostensible benefits of FUPO membership was that the organization assumed responsibility for members' attorneys' fees. It seems that when members availed themselves of attorney services, it was customary for the attorneys to send the invoices directly to FUPO. The checks were then prepared by Madeline Cabrera ("Cabrera") but were not actually sent until so authorized by Morales or De Jesús. Typically, FUPO prepared checks for attorneys' fees totaling $70,000 to $80,000 per month. Around the year 2000, payments made for attorneys' fees declined, even though the invoice amounts actually increased. Although it appears that the checks were being prepared, they were not always sent. Many members complained.

Also in the year 2000, members began to complain about FUPO's failure to provide other promised services. Some members who were suspended from work complained that they were not being paid the money FUPO had promised in the event of suspension. Widows complained that they were not receiving the promised $2000 death benefit. Payments of disability benefits were delayed. At least one FUPO area director informed De Jesús and Morales about these problems, but the problems persisted. When Cabrera became FUPO's Executive Secretary in 2003, she discovered that, while De Jesús was President and Morales Vice-President, FUPO had fallen

-4-

several years behind in its payments of disability benefits and in its payments to the IRS, Hacienda (Treasury of Puerto Rico), and bank credit lines.

FUPO had a bank account at First Bank in Puerto Rico. Morales visited the bank each week. There, he deposited checks made out to FUPO, and because they were issued by various government agencies (police force, fire department, etc.), they cleared immediately. Copies of checks and transaction records introduced at trial indicate that after depositing the checks, Morales then would purchase a manager's check, made out to FUPO, for part of the deposit amount. As for the remainder, he would ask the bank to issue a check against FUPO's account, made out to "cash" for a specified amount (never exceeding $10,000). After the bank prepared the check, Morales would cash it and take the cash with him.

FUPO also had a bank account at Banco Popular de Puerto Rico ("BPPR"), opened by Morales and De Jesús. Morales went to BPPR approximately once a month to deposit the First Bank manager's checks that were made out to FUPO. Then, Morales would issue checks from FUPO's BPPR bank account to himself, to his company (J.R. Bodyguard), and to De Jesús. No single check was ever issued in an amount exceeding $10,000, despite the fact that Morales often issued several checks to himself in the same day whose total amount exceeded $10,000.

Typically, the total value of all checks issued to Morales was between $8,000 and $67,000 per month (totaling more than one million dollars during the course of three years),[1] while those issued to De Jesús ranged from $7,000 to $95,000 per month (totaling more than $1.5 million during the same period).[2] Morales and De Jesús used these funds for personal expenses, including payment of personal credit card bills.

Morales and De Jesús concealed the scheme, which was repeated each month from January 2000 to December 2002, from other FUPO employees including administrative secretary Joanna Lind ("Lind"), who was in charge of FUPO's monthly expenses, and Héctor Navarro-Matos ("Navarro"), who was responsible for filing various FUPO financial reports with the Departments of State and Labor. Also unaware of the fraud was Angel Troche ("Troche"), one of the founders and leaders of FUPO. Troche did not know FUPO was issuing checks to "cash." In fact, neither he nor any of the other directors ever gained access to FUPO's account books.

---

[1] During this period, Morales's reported income (including his FUPO salary) steadily progressed from $36,000 in 1999 to $60,000 in 2001.

[2] During this period, De Jesús reported his FUPO income as ranging from $48,000 in 1998 to $72,000 in 2001.

## II. Analysis

## A. Sufficiency of the Evidence

Morales challenges the sufficiency of the evidence to support his conviction for mail fraud, conspiracy to commit mail fraud, embezzlement, structuring monetary transactions, and conspiracy to commit money laundering. We consider them seriatim. To assess a challenge to the sufficiency of the evidence, "we 'review the record to determine whether the evidence and reasonable inferences therefrom, taken as a whole and in the light most favorable to the prosecution, would allow a rational jury to determine beyond a reasonable doubt that the defendants were guilty as charged.'" United States v. Sullivan, 85 F.3d 743, 747 (1st Cir. 1996) (quoting United States v. Mena-Robles, 4 F.3d 1026, 1031 (1st Cir. 1993)).

### 1. Counts One and Three through Ten: Mail Fraud and Conspiracy to Commit Mail Fraud

Morales claims that the evidence presented at trial was insufficient to support his convictions for mail fraud and conspiracy to commit mail fraud. The mail fraud convictions (Counts Three through Ten) were based on eight separate membership dues checks, mailed between 2000 and 2002, the period during which Morales regularly transferred funds from FUPO's First Bank account to FUPO's BPPR account and then issued checks from FUPO's BPPR account to himself, De Jesús, or one of their personal interests.

To demonstrate a violation of the mail fraud statute, 18 U.S.C. § 1341, the prosecution must prove "(1) the devising or attempting to devise a scheme or artifice to defraud; (2) the knowing and willing participation in the scheme with the specific intent to defraud; and (3) the use of the mails in furtherance of the scheme." United States v. McCann, 366 F.3d 46, 51 (1st Cir. 2004) (citation and internal quotation marks omitted), vacated on other grounds, McCann v. United States, 543 U.S. 1104 (2005). The government must also show, "in order to prove causation, that the defendant knew, or could have reasonably foreseen, that 'the use of the mails [would] follow in the ordinary course of business.'" United States v. Pimental, 380 F.3d 575, 584 (1st Cir. 2004) (quoting Pereira v. United States, 347 U.S. 1, 9 (1954)). Finally, "[i]t is not necessary to prove that the defendant personally executed the mailings, but merely that the defendant caused the mailing by doing some act from which it is reasonably foreseeable that the mails will be used." Id. (citation and internal quotation marks omitted).

As to the first requirement, we have held that "[i]n order to find a 'scheme to defraud,' the jury simply had to determine that [Morales] was attempting to 'wrong[ ] one in his property rights by dishonest methods or schemes.'" Id. at 585 (quoting McNally v. United States, 483 U.S. 350, 358 (1987)). The facts of this case indicate that FUPO membership dues were

-8-

misappropriated for the personal gain of Morales and De Jesús, rather than put to use for the intended purpose of improving the working conditions, professional growth, and legal resources of FUPO members. There is little doubt that a rational jury could find that Morales devised a scheme to defraud within the meaning of the statute.

As to the second requirement of § 1341, Morales does not contend -- and the record does not suggest -- that his participation was in any way unwilling or unknowing. Under the third requirement, a conviction for mail fraud must be supported by evidence that the mail was used in furtherance of the scheme. We have held that "[t]he mailing 'need not be an essential element of the scheme'; it can be merely 'incident to an essential part of the scheme'". Id. at 586 (quoting Schmuck v. United States, 489 U.S. 705, 710-11 (1989)). Here, promotional materials sent by mail were used to recruit new members, whose dues -- often sent by mail -- Morales misappropriated. New members authorized the deduction of FUPO fees from their salaries via forms sent by mail, and Morales and De Jesús in turn sent letters to the relevant agencies, instructing that members' fees be deducted from their salaries, as authorized. It seems quite clear that a rational jury could deduce from these facts that mailing was at least "incident to an essential part" of the fraudulent scheme.

Finally, it is patently clear that a reasonable jury could have found that the use of the mail was foreseeable. In this circuit, "it is simply the 'use of the mails' in the course of the scheme rather than the particular mailing at issue that must be reasonably foreseeable for the causation element of a mail fraud offense to be satisfied." Pimental, 380 F.3d at 589. Once new members had authorized automatic deductions of their FUPO membership dues from their paychecks, FUPO would send a letter -- signed by Morales or De Jesús -- to the relevant agencies and municipalities. FUPO received some fifty checks per month in membership dues through the mail. Morales and De Jesús personally sorted through the mail received at FUPO, kept the checks, and handed over the remainder of the mail to Cabrera. We have no trouble concluding that a jury could have found the use of the mails to be reasonably foreseeable in the course of this scheme.

Morales raises two arguments in support of his contention that the evidence was insufficient to support his mail fraud conviction. First, he claims that because FUPO is a charitable organization engaged in a lawful enterprise, the mail fraud statute is inapplicable. Second, he argues that because no witness testified at trial that he used the mail to defraud FUPO, no rational jury could have convicted him of mail fraud.

In support of his contention that the mail fraud statute does not apply where funds were received through the mail by a

legitimate non-profit organization and then misapplied by its officers, Morales cites only one fifty-year-old case from the Northern District of California. United States v. Beall, 126 F. Supp. 363 (N.D. Cal. 1954). This is not the law of our circuit, and Morales does not persuade us that it should be otherwise.

Morales next contends that because no witness testified at trial as to his use of the mail to further his fraudulent scheme, there was insufficient evidence to support his conviction as to the mail fraud charges. However, direct evidence is not necessary to prove mail fraud. See Pimental, 380 F.3d at 585. We find that the evidence was sufficient to support Morales's mail fraud conviction as to Counts Three through Ten.

To support a guilty verdict as to the conspiracy count under 18 U.S.C. § 371, the evidence must show beyond a reasonable doubt "the existence of a conspiracy, the defendant's knowledge of it, and his voluntary participation in it." United States v. Yefsky, 994 F.2d 885, 890 (1st Cir. 1993). To prove voluntary participation, "the government must prove that the defendant had an intent to agree and an intent to effectuate the object of the conspiracy." United States v. Royal, 100 F.3d 1019, 1029 (1st Cir. 1996). Further, "when the commission of mail fraud is a goal of the conspiracy, the government must show either an intent to use the mails or the reasonable foreseeability of such use." Yefsky, 994 F.2d at 890 (emphasis added).

Evidence introduced at trial revealed that Morales and De Jesús worked together to execute the fraud and that they kept it hidden from all other FUPO members and employees. Morales personally deposited membership checks in FUPO's First Bank account each week and issued checks to himself and De Jesús from FUPO's BPPR account every month. A reasonable jury could have found that there was a conspiracy, of which Morales was aware, and in which Morales participated.

Morales claims that a conviction for conspiracy to commit mail fraud must be supported by a showing of an intent to use the mail to effect the scheme. This position is simply incorrect, as it directly contravenes the law of this circuit. The government need only show the reasonable foreseeability of the use of the mail in the execution of the conspiracy. Id.; see also United States v. Dray, 901 F.2d 1132, 1137 (1st Cir. 1990); United States v. Delgado-Figueroa, 832 F.2d 691, 696 (1st Cir. 1987).

### 2. Counts Eleven and Twelve: Embezzlement of Labor Union Funds

Morales claims there was no federal jurisdiction as to Counts Eleven and Twelve because they were based on the premise that FUPO is a labor organization engaged in an industry affecting interstate commerce, as defined by § 402(j) of the Labor Management Reporting and Disclosure Act ("LMRDA"). Section § 501(c) of the LMRDA is violated by "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or

-12-

the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly."  29 U.S.C. § 501(c) (emphasis added).  The term "labor organization" is defined by the LMRDA as an organization "engaged in an industry affecting commerce and includes any organization . . . in which employees participate and which exists for the purpose, in whole or part, of dealing with employers . . ."  29 U.S.C. § 402(i) (emphasis added).

Morales appeals his conviction as to Counts Eleven and Twelve on the ground that FUPO is not a labor organization under the LMRDA because it is not "engaged in an industry affecting commerce."[3]  For its part, the government does not respond to this argument at all.[4]

_____

[3]  Morales also claims that FUPO is not a labor organization because Puerto Rico law prohibits police officers from organizing or engaging in collective bargaining.  However, Morales was convicted under LMRDA, a federal statute.  Morales develops no argument as to why Puerto Rico law -- rather than federal law -- should control this case, and we consider this line of inquiry no further.

[4]  Instead, the government inexplicably focuses on an altogether separate component of the definition of a labor organization under § 402(i), that it exists "for the purpose, in whole or part, of dealing with employers." 29 U.S.C. § 402(i)(emphasis added). Because Morales does not challenge FUPO's status as a labor union with respect to this requirement, we consider the argument waived. See, e.g., Am. Cyanamid Co. v. Capuano, 381 F.3d 6, 18 (1st Cir. 2004).

-13-

The LMRDA deems a labor organization to be "engaged in an industry affecting commerce" if it

> (1) is the certified representative of employees under the provisions of the National Labor Relations Act, as amended [29 U.S.C.A. § 151 et seq.], or the Railway Labor Act, as amended [45 U.S.C.A. § 151 et seq.]; or
>
> (2) although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or
>
> (3) has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or
>
> (4) has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or
>
> (5) is a conference, general committee, joint or system board, or joint council, subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection, other than a State or local central body.

29 U.S.C. § 402(j). Morales argues that FUPO does not meet any of the above requirements because the vast majority of FUPO's members are police officers employed by the Commonwealth of Puerto Rico and thus FUPO is not the representative of employees of an employer or

-14-

employers engaged in an industry affecting commerce. The LMRDA defines the phrase "industry affecting commerce" as

> any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor Management Relations Act, 1947, as amended [29 U.S.C. §§ 141 et seq.], or the Railway Labor Act, as amended [45 U.S.C. §§ 151 et seq.].

29 U.S.C. § 402(c). At trial, the government presented evidence to the jury of FUPO's activities "affecting commerce," consisting of the following: the majority of FUPO's members are members of the police force in Puerto Rico, which uses Smith and Wesson firearms, Crown Victoria cars, and helicopters, none of which are manufactured in Puerto Rico; and FUPO has six or seven dues-paying members who work for J.R. Bodyguard, a private security company that uses armored trucks purchased in Canada, cars manufactured by Suzuki, arms manufactured by Smith and Wesson, and which services national companies like Sam's Club and Office Max. Morales cites nary a case to support his contention that these activities do not constitute engagement in an industry affecting commerce and are thus not sufficient to qualify FUPO as a labor organization under the statute. Our standard of review constrains us to consider the evidence in the light most favorable to the verdict. A reasonable jury could conclude that FUPO was sufficiently engaged in commerce

-15-

to satisfy the statute, and we affirm Morales's conviction as to Counts Eleven and Twelve.

### 3.   Count Thirteen:   Structuring Monetary Transactions

Morales argues that there was insufficient evidence to sustain his conviction for structuring monetary transactions. The Bank Secrecy Act requires domestic banks to report any transactions involving more than $10,000 in cash (such reports are known as cash transaction reports, or "CTR"). See 31 U.S.C. § 5313. Further, "[n]o person shall, for the purpose of evading the reporting requirements of section 5313(a) . . . structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions." Id. § 5324(a)(3). The Supreme Court has defined structuring as "to break up a single transaction above the reporting threshold into two or more separate transactions for the purpose of evading a financial institution's reporting requirement." Ratzlaf v. United States, 510 U.S. 135, 136 (1994).

Morales contends 1) that the evidence was insufficient because none of the government witnesses testified as to any willful violation of the structuring statute, and 2) that because the transactions in question involved checks, not cash, they do not fall within the ambit of 31 U.S.C. § 5324.

Evidence introduced at trial reveals that BPPR never filed a CTR for any of Morales's transactions because he never

-16-

issued a check in excess of $10,000, despite the fact that he often issued several checks to himself on the same day, whose total value exceeded that amount. Similarly, of the numerous handwritten checks made out to "cash" signed by Morales and drawn upon FUPO's First Bank account, none exceeded $10,000, even when the total value of checks cashed in a single day exceeded $10,000. Additionally, the checks that Morales's brothers cashed from FUPO's First Bank account never exceeded $10,000.

Morales maintains that there was insufficient evidence to support his conviction because none of the government witnesses testified that Morales ever willfully caused a financial institution to fail to file a CTR. Although this argument is quite poorly developed, we assume that its intention is to suggest that his violation of § 5324 was not willful. In Ratzlaf, the Supreme Court held that a structuring conviction requires a showing "that the defendant acted with knowledge that his conduct was unlawful." 510 U.S. at 137. However, Congress later amended the statute so that willfulness is no longer required for a violation of 31 U.S.C. § 5324. See Aversa v. United States, 99 F.3d 1200, 1205 n.4 (1st Cir. 1996).

Drawing all reasonable inferences in favor of the verdict, we have no doubt that the evidence presented in this case would permit a rational jury to find that Morales violated the anti-structuring statute. During the period between January 2000

and December 2002, Morales prepared dozens of BPPR checks, drawn against FUPO's account and made out to cash, for a total value of well over $1,000,000. Not a single check exceeded $10,000 in value. The consistent avoidance of the $10,000 threshold over a period of almost three years would, in our view, permit a jury to conclude that Morales divided all transactions above the reporting threshold "for the purpose of evading the reporting requirements," in violation of § 5324.

Morales next argues that the transactions that served as the basis for his conviction do not come within the ambit of sections 5314 and 5324 of Title 31 because they involved checks and not cash. This argument fails because many of the transactions in question involved cashing checks, such that Morales -- or someone sent on his behalf -- would routinely exit the bank with thousands of dollars in cash. We have observed that "[t]he most common method of 'structuring' is to divide sums of cash into amounts that are either under the $10,000 reporting threshold or into amounts that are larger but still less likely to attract attention." United States v. Hurley, 63 F.3d 1, 12 (1st Cir. 1995). The evidence in this case suggests that Morales acted exactly as Hurley describes. Morales develops no argument as to why this activity does not fall within the purview of the Bank Secrecy Act, which "requires domestic banks to report any transactions involving more than $10,000 in cash." Id. (emphasis added). We find that his

activity was exactly the sort that 31 U.S.C. § 5324(a)(3) proscribes.

### 4. Count Fourteen: Conspiracy to Commit Money Laundering

Morales was convicted of conspiracy to commit money laundering under 18 U.S.C. § 1956(h). To find Morales guilty, the jury had to find that the government proved beyond a reasonable doubt that Morales conspired with De Jesús to commit the offense of money laundering, which is comprised of four elements:

> (1) that [Morales] knowingly conducted a financial transaction, (2) that he knew the transaction involved funds that were the proceeds of some form of unlawful activity, (3) that the funds involved were in fact the proceeds of a specified unlawful activity, and (4) that [Morales] engaged in the financial transaction knowing that it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity.

United States v. Cruzado-Laureano, 404 F.3d 470, 483 (1st Cir. 2005) (internal quotation marks omitted).

Morales claims that no rational jury could have convicted him of money laundering because 1) he did not conduct any financial transactions that affected interstate commerce; 2) he did not engage in any transaction knowing that it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity; and 3) the government did not present any direct evidence to

-19-

establish that he conducted financial transactions to conceal the nature of his mail fraud activities.

Morales first maintains that he was not properly convicted under the money laundering statute because he did not conduct a "financial transaction" within the meaning of 18 U.S.C. § 1956(c)(4).  That section defines a financial transaction as

> (A) a transaction which in any way or degree <u>affects interstate or foreign commerce</u> (i) involving the movement of funds by wire or other means or (ii) involving <u>one or more monetary instruments</u>, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) <u>a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree</u>;

18 U.S.C. § 1956(c)(4) (emphases added).  Morales only addresses part (A), claiming that he was involved in no transaction that affected interstate or foreign commerce.  He entirely ignores the remainder of this subsection.

Even if we accept, <u>arguendo</u>, Morales's contention that he was involved in no financial transaction affecting interstate commerce within the meaning of subsection (A), we find that a jury could have determined that he was involved in financial transactions as defined in subsection (B).  The government's case included evidence that Morales and De Jesús retained exclusive control of the membership dues checks received by mail, that they deposited the majority of the checks so received in FUPO's First

-20-

Bank account each month, that they then transferred funds -- using manager's checks -- from FUPO's First Bank account to its BPPR account, and that Morales and De Jesús regularly issued checks to themselves from the BPPR account. Each of these actions -- depositing checks at a bank, transferring funds from one bank to another, and issuing checks -- involved one or more financial institutions engaged in interstate commerce. Given these facts, we think a rational jury could easily have found that Morales conducted a financial transaction within the plain meaning of 18 U.S.C. § 1956(c)(4)(B).

Morales next challenges the sufficiency of the government's evidence as to the fourth element of the Cruzado-Laureano test, claiming that "absolutely no evidence" -- either direct or circumstantial -- was presented at trial to establish that he engaged in any financial transaction knowing that it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity. Morales points to United States v. Dimeck, 24 F.3d 1239 (10th Cir. 1994), to support his argument that, even if the checks that he issued to himself and De Jesús were the proceeds of illegal activity, his activities did not constitute money laundering. In Dimeck, the court found that the mere transportation of concealed drug money did not constitute money laundering because the money laundering statute "was designed to

-21-

punish those . . . who thereafter take the additional step of attempting to legitimize their proceeds so that observers think their money is derived from legal enterprises." Id. at 1247. We find the facts of Dimeck to be easily distinguishable from the present case. The facts, when considered in a light most favorable to the verdict, suggest that Morales did far more than simply transport ill-gotten wealth. A rational jury could have found the evidence sufficient to indicate that Morales's monthly secretive transfer of FUPO membership funds between three separate bank accounts -- FUPO's First Bank account, FUPO's BPPR account, and Morales's personal BPPR account -- was an attempt to conceal the nature, location, source, ownership, and control of proceeds. Further, a jury could have found that Morales's practice of limiting the value of each check issued to himself or De Jesús to $10,000 so as to avoid bank reporting, indicates an effort to conceal the true nature, source, and ownership of the proceeds. Specifically, we think it quite clear that a jury could have found that these complicated machinations were intended to create the appearance of legitimate income.

Finally, Morales suggests that the evidence at trial was insufficient to support his conviction because no government witness directly testified as to his participation in any money laundering activity. However, we have held that circumstantial evidence can be sufficient to support a money laundering

conviction. Cruzado-Laureano, 404 F.3d at 483 ("A conviction requires evidence of intent to disguise or conceal the transaction, whether from direct evidence, like the defendant's own statements, or from circumstantial evidence, like the use of a third party to disguise the true owner, or unusual secrecy."). In this instance, the lack of direct evidence is a direct result of the secret conspiracy between Morales and De Jesús. The fact that only Morales and De Jesús knew of the scheme only emphasizes its secretive nature and the deceit involved with its execution. Everyone else at FUPO -- from top-level officers to administrative secretaries -- was kept in the dark. For these reasons, we find that a rational jury could have found the evidence at trial sufficient to convict Morales of conspiracy to commit money laundering.

## B.  **Brady Violation**

Morales argues that the government breached its duty under Brady v. Maryland, 373 U.S. 83 (1963), to provide him with exculpatory evidence in its possession. On August 18, 2003, Morales filed a motion requesting any exculpatory information from the government, consistent with Brady. On August 25, the district court granted the motion. By letter dated August 26, the government noted that "[a]s of this date, no exculpatory evidence has been uncovered," but promised to "provide any exculpatory evidences which may be uncovered in the future."

Morales maintains that, at the time of the prosecution's August 26 letter, the government was already in possession of exculpatory evidence that it failed to disclose, in violation of Brady. The evidence in question was the contents of two FBI reports detailing interviews with De Jesús. In those reports, De Jesús stated -- among other things -- that he had won approximately $2.5 million over the course of three years in a horse race, which had enabled him to regularly loan money to FUPO. Specifically, he said that during an approximately three-year period, he had lent more than $300,000 to FUPO, and that Morales had lent FUPO $75,000. De Jesús explained that the money he and Morales took from FUPO's bank accounts constituted repayment of the loans. As evidence, De Jesús presented copies of two cancelled checks, dated 1998 and 1999, drawn on his personal account and made out to FUPO for $50,000 and $100,000 respectively. Morales claims that the government never informed him of the contents of these reports or of the two cancelled checks. He argues that this information was material and exculpatory because it provided a legitimate explanation for his appropriation of FUPO's funds.

An alleged Brady violation must satisfy three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v.

-24-

Greene, 527 U.S. 263, 281-82 (1999). We review the district court's denial of a motion for a new trial on the basis of alleged Brady violations for manifest abuse of discretion. United States v. Hansen, 434 F.3d 92, 102 (1st Cir. 2006).

Morales claims that all three prongs are satisfied because the information was exculpatory, the prosecution suppressed it, and there was a reasonable probability that the verdict would have been different if the evidence had been disclosed to the jury. We consider each element in turn.

Morales claims that the evidence was exculpatory because it provided a legitimate explanation for his activities. We disagree. Even assuming the credibility of De Jesús's statements regarding his loan to FUPO of $300,000 and Morales's loan of $75,000, there still remains $2.4 million of FUPO funds unaccounted for. Further, the allegedly exculpatory reports include many statements by De Jesús, ignored in Morales's brief, that are actually incriminating to Morales. For example, the report reflects 1) that De Jesús admits that "he kept writing checks to himself and Morales after he felt that he had repaid himself for the loans"; 2) that De Jesús and Morales continued writing checks to themselves because "they started the organization and they looked on it as their own money"; 3) that they always wrote the checks for $10,000 or less "so that they could avoid notification to Hacienda and the federal reporting requirements"; 4) that De

-25-

Jesús never reported the money he took from FUPO to Hacienda on his tax returns and does not believe Morales did either; 5) that De Jesús believes that he has taken between $1 million and $1.5 million from FUPO in addition to what he claims to have lent the organization; and 6) that De Jesús believes Morales used the funds to open and support several security businesses.  Although we are not convinced that this evidence was exculpatory, we proceed to the second prong of Brady.

Under Brady, the government is obligated to disclose exculpatory evidence.  373 U.S. at 87.  Assuming that the evidence in question is exculpatory, we find no Brady violation because the government did not suppress it.  The government allowed the defense to conduct open-file discovery of all documents in its possession, which included the FBI reports of De Jesús's statements, which the government requested to be returned only after the defense had an opportunity to read them.  At sentencing, the district judge found unpersuasive Morales's claim that the government requested the return of the documents before the defense had an opportunity to read all of them.  We find no abuse of discretion.

Finally, a valid Brady claim requires a showing that the evidence in question was material.  The Supreme Court has made quite clear that, for Brady purposes, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would

have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). We find that the proffered evidence was not material. The evidence against Morales was very strong, and De Jesús's statements contained within the allegedly exculpatory FBI reports only served to corroborate the prosecution's theory of the case. Further, even if credible, De Jesús's explanation of the scheme leaves almost $2.5 million unaccounted for. We find no Brady violation.

## C. Sentencing Guidelines

Morales contends that the district court improperly delegated its sentencing authority when it imposed a supervised release condition requiring Morales to submit to a drug test within fifteen days of release, and thereafter to random drug testing not to exceed 104 samples per year. Morales claims that this condition warrants remand for re-sentencing in light of United States v. Booker, 543 U.S. 220 (2005).

Morales did not preserve his Booker claim below, and thus our review is for plain error. See United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir. 2005). Similarly, Morales did not object to the supervised release conditions at sentencing, and our review of that issue is for plain error. See United States v. Padilla, 415 F.3d 211, 218 (1st Cir. 2005) (en banc). In order for us to correct an error to which there was no objection in the district court, "[t]here must be an 'error' that is 'plain' and that 'affect[s] substantial rights.'"

-27-

Antonakopoulos, 399 F.3d at 77 (quoting United States v. Olano, 507 U.S. 725, 732 (1993)).

Morales claims that the supervised release terms were an impermissible delegation of judicial authority. Morales specifically claims that the supervised release terms allowed the probation officer to decide the number of drug tests to which he would need to submit. It is the law of this circuit that, in stipulating the terms of a supervised release provision, a sentencing judge "may not . . . vest the probation officer with the discretion to order an unlimited number of drug tests." United States v. Meléndez-Santana, 353 F.3d 93, 103 (1st Cir. 2003), rev'd on other grounds, Padilla, 415 F.3d at 215. However, Morales's claim fails because no such delegation actually occurred in this case. At sentencing, the judge ordered Morales to

> refrain from the unlawful use of controlled substances and submit to drug testing within fifteen days of release. Thereafter submit to random drug tests not to exceed 104 samples per year, in accordance with the drug after care program policy of the U.S. probation office, approved by this Court.

The probation officer did not have unlimited discretion to order an unlimited number of tests. Rather, the sentencing judge clearly established an upper limit to the number of drug tests that can properly be ordered upon Morales's release. In a recent case raising almost the identical issue, we held that where, as here, the "district court itself required that defendant submit to random

drug testing 'not to exceed 104 samples per year,'" there was no delegation error.  <u>United States</u> v. <u>Laureano-Vélez</u>, 424 F.3d 38, 41 (1st Cir. 2005).  Because we find no error, we need not reach the other prongs of plain error review.

Morales next maintains that the supervised release condition warrants remand in light of <u>Booker</u>.[5]  The government concedes that the district court treated the sentencing guidelines as mandatory.  In <u>Antonakopoulos</u>, we held that "[t]he first two <u>Olano</u> requirements -- that an error exists and that it is plain at the time of appeal -- are satisfied whenever the district court treated the Guidelines as mandatory at the time of sentencing." 399 F.3d at 75.  Under the third prong we ask "whether [Morales has] pointed to circumstances that create a reasonable probability that the district court would have imposed a more lenient sentence had the guidelines been advisory." <u>United States</u> v. <u>Sánchez-Berríos</u>, 424 F.3d 65, 80 (1st Cir. 2005).  Morales has made no such showing.

### III.  Conclusion

For the foregoing reasons, we affirm Morales's conviction and sentence.

<u>        **Affirmed**</u>.

---

[5]  Morales does not contend that remand is warranted so that the district court can reconsider the severity of the sentence in light of <u>Booker</u>.  Thus, we do not consider this possibility.