**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Kevin J. DIMECK, Defendant-Appellant.**

No. 93–3075.

United States Court of Appeals, Tenth Circuit.

May 17, 1994.

Sarah Hunter of Richard M. Lustig, P.C., Birmingham, MI (Richard M. Lustig of Richard M. Lustig, P.C., on the briefs) for defendant/appellant.

Leon J. Patton, Asst. U.S. Atty., Kansas City, KS (Randall K. Rathbun, U.S. Atty., on the briefs) for plaintiff/appellee.

Before EBEL and KELLY, Circuit Judges, and COOK, District Judge.*

EBEL, Circuit Judge.

This case is before us on appeal from a jury verdict convicting Appellant, Kevin Dimeck ("Dimeck"), of conspiracy under 18 U.S.C. § 371 to violate 18 U.S.C. 1956(a)(1)(B)(i). Dimeck appeals the district court's denial of his Fed.R.Crim.P. 29(a) Motion for Judgment of Acquittal in which he asserted that the government failed to prove each element of conspiracy to launder money under § 1956(a)(1)(B)(i). Dimeck asserts that the mere delivery of alleged drug-money by one courier to a second courier, who was to deliver the money to the seller of the drugs, does not constitute money laundering under § 1956(a)(1)(B)(i). We agree. We also hold that the government has failed to prove that the effort to retrieve the money from the DEA, after it was confiscated from the government's informant acting as the second courier, was within the scope of the object of the initial conspiracy involving Dimeck. Accordingly, Dimeck is not responsible for that conduct. Therefore, we REVERSE the jury's verdict.[1]

## I. BACKGROUND

Dimeck was charged, along with two other individuals, with conspiracy under 18 U.S.C. § 371 to violate 18 U.S.C. § 1956(a)(1)(B)(i) in connection with the delivery of drug proceeds. One of the individuals, Arnoldo Pruneda, entered a pretrial guilty plea.[2] Dimeck was tried with codefendant Benjamin Salcido.[3] After a jury trial, Dimeck was convicted of engaging in a conspiracy, from January 6, 1992 through April 27, 1992, to conduct a financial transaction with the proceeds of a marijuana sale, knowing that the property involved in the transaction represented the proceeds from unlawful activity, and further knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, and ownership of the proceeds of the unlawful activity. The court sentenced Dimeck to forty-six months incarceration.

Dimeck asserts that the government failed to establish each element of a conspiracy to launder money under § 1956(a)(1)(B)(i).[4]

---

* The Honorable H. Dale Cook, Sr., United States District Judge for the Northern District of Oklahoma, sitting by designation.

1. Dimeck also appeals his sentence under the Sentencing Guidelines, the district court's denial of his motion to suppress evidence, and the district court's admission of evidence that Dimeck asserts was irrelevant and prejudicial. In light of our decision, we need not decide these issues.

2. Pruneda, Benjamin Salcido and a fourth individual, Richard Lontayo, were also charged under other substantive counts in the indictment.

3. Salcido has filed a related appeal, Docket No. 93–3072.

4. 18 U.S.C. § 1956 provides in relevant part:
(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity,

conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ...
   (B) knowing that the transaction is designed in whole or in part—
   (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; ...
   shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both....
Dimeck argues that a more appropriate charge would have been under 18 U.S.C. § 1956(a)(1)(A)(i) rather than 18 U.S.C. § 1956(a)(1)(B)(i). Section 1956(a)(1)(A)(i) provides:
   Whoever, knowing that the property involved in a financial transaction represents the pro-

"In judging the sufficiency of the evidence, we are bound to view the proof presented in the light most favorable to the government to ascertain if there is sufficient substantial proof, direct and circumstantial, together with reasonable inferences to be drawn therefrom, from which a jury might find a defendant guilty beyond a reasonable doubt." *United States v. Johnson,* 971 F.2d 562, 565 (10th Cir.1992) (quoting *United States v. Sullivan,* 919 F.2d 1403, 1431 (10th Cir.1990)).

■ To sustain a conviction under § 1956(a)(1)(B)(i), the government must plead and prove that a defendant:

(1) knew the property involved in a financial transaction represented the proceeds of some unlawful activity;

(2) conducted or attempted to conduct a financial transaction which involved the proceeds of unlawful activity; [and,]

(3) knew the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds from the unlawful activity.

*United States v. Levine,* 970 F.2d 681, 686 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 289, 121 L.Ed.2d 214 (1992).[5]

■ Under its indictment, the government had to prove that Dimeck was part of a conspiracy to violate § 1956(a)(1)(B)(i). To prove a conspiracy, the government must show by direct or circumstantial evidence (1) that two or more persons agreed to violate the law, (2) that Dimeck knew at least the essential objectives of the conspiracy, (3) that Dimeck knowingly and voluntarily became a part of it, and (4) that the alleged coconspirators were interdependent. *United States v. Evans,* 970 F.2d 663, 668 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993).[6]

The facts, in the light most favorable to the government, show that Pruneda was shipping marijuana into the Detroit area for distribution. In order to receive the proceeds from the Detroit sales, Pruneda asked Moore, a government informant, to go to Detroit to pick up a package containing $60,000 in proceeds from marijuana transactions and to deliver the money back to Pruneda in California. Apparently, Dimeck was to collect the Detroit funds and to deliver them to Moore in Detroit for delivery back to Pruneda in California. The transfer from Dimeck to Moore was to occur in a Detroit hotel room.[7] Dimeck was late with the delivery, which made Pruneda nervous because he had a deadline to deliver the money to his suppli-

ceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
  (A)(i) with the intent to promote the carrying on of specified unlawful activity * * *
Because the issue is not before us, we express no opinion on § 1956(a)(1)(A)(i).

5. The definition section of § 1956 provides in relevant part:

  (c) As used in this section—
  (1) the term "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity" means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7); ...
  (3) the term "transaction" includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange

of currency, loan, extension or credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;
  (4) the term "financial transaction" means (A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree; ...

6. Confidential informants and government agents cannot serve as the second party to a conspiracy. *United States v. Barboa,* 777 F.2d 1420, 1422 (10th Cir.1985).

7. Dimeck challenges the sufficiency of the evidence as to his identity; however, we need not reach this issue.

ers. Pruneda, referring to the $60,000 during telephone conversations, told Moore, "I owe that," and "[t]hese guys are kicking my ... doors down."

On January 10, 1992, several days later than Pruneda expected, Dimeck drove in his company van bearing a "Michigan Satellite Systems" logo to Moore's motel and delivered an unsealed, untaped box, also bearing the company logo, to Moore. The box contained approximately $60,000. Dimeck told Moore to put the money in his suitcase, but when Moore objected because he did not have enough room in his suitcase, Dimeck said that he could "take it out of [the box] or whatever you want.... [and] tape [the box] up so it's not open, okay."

Pruneda did not want Moore to fly to California with the money because he was afraid airport security would detect it. However, Pruneda's urgent need for the money to pay his suppliers led him to agree that Moore should fly. Rather than deliver the money to Pruneda, however, Moore gave the money to the DEA and told Pruneda that he had been stopped by the police and that they had seized the money. Pruneda told Moore that this had happened before. Pruneda and Moore then devised a way for Moore to lie about how he came to possess the money so that the DEA would return the money to Moore.[8]

In early March 1992, Moore told Pruneda that the DEA would return the money to Moore in the form of a check. Pruneda initially said he would pick up the money, and then later arranged for Salcido to pick up the money after Moore cashed the check. Salcido wanted the money in large bills so that it would be less detectable when he went through the airport security checkpoints. Salcido was arrested when Moore delivered the money to him.[9]

## II. MONEY LAUNDERING

Dimeck argues that his money laundering conviction should be overturned because the evidence was insufficient to establish that he entered into an agreement to conduct a financial transaction with the intent to conceal the nature, source, location, or ownership of the proceeds of illegal activity. He specifically challenges the district court's holding that "merely transporting cash" is a "transaction" prohibited by the money laundering statute, *United States v. Dimeck*, 815 F.Supp. 1425, 1432 (D.Kan.1993), and the court's finding that he was part of the later conspiracy in which Pruneda and Moore devised a scheme to retrieve the money from the DEA.

The district court found that the government presented sufficient evidence from which a jury could reasonably infer that "[t]he very nature of the agreement between Pruneda and [Dimeck]—an agreement to conduct a transaction by transporting, or causing to be transported, a large amount of cash (which was proceeds from illegal activities) from Detroit to California—revealed a common design to conceal the source, nature, or ownership of the money being transported," in violation of § 1956(a)(1)(B)(i). *Id.* at 1431. The court found that the concealment was evidenced by "Dimeck's actions in telling Moore to tape up the box and inquiring of Pruneda about any markings on the box that would tie the money to him after it was seized by police." *Id.* at 1433. The court also found that Pruneda, Salcido, and Dimeck were engaged in a single conspiracy, and that it was reasonably foreseeable that within that conspiracy "the money could be confiscated during a routine traffic stop and that Pruneda would advise Moore about how to get it back." *Id.* at 1433, n. 10.

Assuming, without deciding, that the evidence was sufficient for a reasonable jury to conclude that: (a) Dimeck delivered the box

---

**8.** Pruneda also told Moore that Dimeck had expressed concern that the box might contain his company's markings. The government makes much of this fact; however, it is reasonable to assume that Dimeck would be worried that his role as a courier for drug money might be discovered.

Pruneda also allegedly told Moore that his "friends" in Detroit could not find any information about the "bust." However, the government does not assert that Pruneda ever identified who these "friends" were.

**9.** Moore actually delivered a bag full of paper that he represented to be the money.

of money to Moore's hotel room; (b) Dimeck told Moore to tape up the box or in some other way not to transport the money in plain view; (c) the money represented proceeds of specified illegal activity as defined in 18 U.S.C. § 1956; (d) the money was enroute to Pruneda; (e) Pruneda owed the money and planned to use the money to pay his suppliers; (f) Dimeck, Pruneda, and Moore were part of a conspiracy to effect the transport of the money from Detroit to California; and (g) Pruneda and Moore devised a scheme to lie to the DEA and police to retrieve the money, we must decide: 1) whether the transportation and delivery of illegal proceeds by couriers to the seller of the drugs constitute money laundering under § 1956(a)(1)(B)(i), and 2) whether the scheme in which Pruneda and Moore attempted to retrieve the illegal proceeds from the DEA constituted an act in furtherance of the object of the initial conspiracy to transport the illegal proceeds to Pruneda.[10] If we decide that efforts to retrieve the illegal proceeds were not within the scope of the initial conspiracy to transport the illegal proceeds, then we must decide whether there was sufficient evidence for a reasonable jury to conclude that Dimeck was a member of a second conspiracy.

This inquiry causes us first to examine the scope of § 1956(a)(1)(B)(i) insofar as it applies to courier delivery of illegal drug money. This presents a case of first impression in this circuit, although we have examined this section of the money laundering statute in several other cases in the context of the ultimate expenditure of drug funds. In *United States v. Edgmon* we examined the legislative history of § 1956 and decided that "Congress aimed the crime of money laundering at conduct that *follows in time* the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity.'" 952 F.2d 1206, 1213–14 (10th Cir.1991) (emphasis added), *cert. denied,* —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992). We concluded that "Congress intended simply to add a new criminal offense to punish activity that was not previously punished criminally." *Id.* In

*Edgmon,* we declined to find a double jeopardy violation even though some of the evidence of conversion and money laundering overlapped because, "[t]o convict of money laundering, the jury had to find that Edgmon, Sr., not only assisted in the conversion ... but that he then attempted to take the proceeds of that conversion and enter financial transactions designed to conceal the origin of those proceeds." *Id.*

In *United States v. Sanders,* we "reject[ed] the government's argument that the money laundering statute [18 U.S.C. § 1956(a)(1)(B)(i)] should be interpreted to broadly encompass all transactions, however ordinary on their face, which involve the proceeds of unlawful activity," 929 F.2d 1466, 1472 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991). We declined to interpret the money laundering statute in such a manner because to do so would turn the "money laundering statute into a 'money spending statute.'" *Id.* In *Sanders,* the defendant purchased two vehicles, in two separate transactions, for family use with proceeds from illegal activity. The Sanderses did not use a third party to purchase the cars for them and they conspicuously used them. We held that there was insufficient evidence of concealment in defendant's car purchases to support the money laundering conviction. *Id.* at 1473.

In *United States v. Lovett,* 964 F.2d 1029 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 169, 121 L.Ed.2d 117 (1992), we applied the *Sanders* reasoning to determine which of Lovett's purchases, made with money taken from his grandmother, fell within the scope of § 1956. We held that as to the purchase of a house, a reasonable jury could have found that the defendant made numerous conflicting statements and convoluted financial transactions to quell the bank employees' suspicions regarding his activities and that the defendant purchased the house to conceal the proceeds of the fraudulent activity. *Id.* at 1034.

We reversed Lovett's conviction with respect to his purchase of a GMC Suburban,

---

10. The government referred to the essential goal of the conspiracy as being "the transportation of proceeds from the sale of marijuana." Appellee Br. at 21.

however, because there was insufficient evidence that he made the purchase with an intent to conceal the nature or source of the proceeds of the fraudulent activity. *Id.* at 1036. Although Lovett made statements to the car salesman that created the impression that his siding business was doing well, we held that this was not enough to show that he made those statements to justify or explain his ability to purchase the Suburban with cash. *Id.* Furthermore, "merely spending the proceeds of illegal activities does not violate the money laundering statute." *Id.* (quoting *Edgmon,* 952 F.2d at 1210).

Finally, in *United States v. Garcia–Emanuel,* 14 F.3d 1469 (10th Cir.1994), we reviewed seventeen money laundering counts under § 1956(a)(1)(B)(i). Each of the counts involved the defendant's use of drug proceeds to make various purchases, such as mortgage payments on the defendant's residence, acquisition of land in the name of a restaurant owned by defendant, purchase of a certificate of deposit to be used as collateral for a subsequent loan, purchase of several race horses and other consumer items, and wiring money to another bank account of a Columbian national. We held that some of those transactions constituted money laundering and some did not. The mere use of illegal proceeds for the purchase of personal items did not constitute money laundering. To violate the statute, it was necessary that the transaction be motivated significantly by a desire to create the appearance of legitimate wealth or otherwise to conceal the nature of the funds so that they might enter the economy as legitimate funds. We stated:

> The President's Commission on Organized Crime described money laundering as schemes designed to assist criminals who 'seek to change large amounts of cash … into an ostensibly legitimate form, such as business profits or loans, *before using those funds for personal benefit'* ….
> Similarly, the Department of the Treasury described the purpose of money laundering as 'conceal[ing] the illicit sources of their monies by *creating the appearance of legitimate wealth'* ….
>
> … Merely engaging in a transaction with money whose nature has been concealed through other means is not in itself a crime. In other words, the government must prove that the specific transactions in question were designed, at least in part, to launder money, not that the transactions involved money that was previously laundered through other means. If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute.
>
> ….
>
> … [What is prohibited are activities designed to further a] launderer's goal of 'plac[ing] illicit bulk·cash in an economy, [so] it becomes increasingly difficult to uncover their money laundering operation.'

*Garcia–Emanuel,* 14 F.3d at 1474–77 (quotations omitted).

Other circuits have examined whether the possession and transportation of illegal proceeds constitute money laundering under § 1956(a)(1)(B)(i). In *United States v. Gonzalez–Rodriguez,* the Fifth Circuit held that the government failed to prove that the defendant's possession or transportation of the drug money was "designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified illegal activity." 966 F.2d 918, 925 (5th Cir.1992) (quoting 18 U.S.C. § 1956(a)(1)(B)(i)). When the defendant was questioned at the Houston airport, she readily disclosed and turned over the $8000 she was carrying and made no false exculpatory statements about the money. *United States v. Puig–Infante,* 19 F.3d 929 (5th Cir.1994) (mere transportation without disposition of illegal drug proceeds is not a prohibited transaction under the money laundering statute).

The Sixth Circuit, in *United States v. Samour,* 9 F.3d·531 (6th Cir.1993), considered whether transporting drug money concealed in an automobile or hidden on one's person constitutes a violation of § 1956(a)(1)(A)(i) or (a)(1)(B)(i). The court held that "merely transporting cash does not meet the definition of 'financial transaction' for purposes of the money laundering statute." *Id.* at 536. In *Samour,* the defendant was part of a conspiracy to distribute marijuana. Samour

was caught transporting $30,000 and was part of a drug ring in which he would give codefendant Reynolds money that Reynolds would then deliver to a man named Cha Cho in exchange for marijuana. The Sixth Circuit reasoned that "[a] central focus of subsection (a)(1)(B)(i) is to criminalize the 'conversion of cash into goods and services as a way of concealing or disguising the wellspring of the cash.'" *Id.* at 535 (internal citations omitted). The court found that Samour merely transported cash and therefore did not engage in a "financial transaction." Moreover, the court expressed its "reluctan[ce] to conclude that a physical transportation of money, whether it is domestic or international, constitutes a 'financial transaction' within the meaning of section 1956(a)(1) because Congress specifically created a separate subsection for mere transportation of funds." *Id.* at 536.

Although we agree with the result reached in *Samour,* we are not confident in the reasoning advanced there. It seems to us that the movement of drug proceeds may constitute a transaction as defined by § 1956(c)(3). Subsection 1956(c)(3) defines "transaction" to include "delivery" of the illegal proceeds. A "financial transaction" includes "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or *other means* or (ii) involving *one or more monetary instruments.*" § 1956(c)(4) (emphasis added).[11] Dimeck moved funds by "other means" when he delivered the funds to Moore. Furthermore, Dimeck was part of a conspiracy that was designed, at least in part, to move monetary instruments across state lines.

Nonetheless, we find that Dimeck's money laundering conviction cannot be supported solely on the basis of his courier activity because delivery of the money did not result in the kind of transaction prohibited by § 1956(a)(1)(B)(i). That section only prohibits financial transactions designed to conceal or disguise certain *listed attributes* of

the proceeds: "the nature, the location, the source, the ownership, or the control of the proceeds." § 1956(a)(1)(B)(i). *See Garcia–Emanuel,* 14 F.3d at 1474 (section 1956(a)(1)(B)(i) is "aimed at transactions that are engaged in for the *purpose* of concealing assets"); *United States v. Jackson,* 935 F.2d 832, 838 (7th Cir.1991). The statute's focus is on these characteristics of illegal proceeds because they are characteristics which, when concealed or obliterated, allow illegal proceeds to be passed into commerce as legitimate proceeds more easily. Here, the seller, Pruneda, wanted to receive the illegal proceeds as illegal funds. The use of Dimeck and Moore as couriers, and the secrecy surrounding the funds, were not to confuse or mislead anyone as to the characteristics of those proceeds, or to assist in allowing these proceeds to enter into legitimate commerce. Rather, the courier's role was simply to deliver the funds to Pruneda *as illegal funds.* Therefore, the government failed to show that the transaction was designed to disguise or conceal the *attributes* of the illegal proceeds.

This is why we stressed in *Edgmon* that a violation of § 1956(a)(1)(B)(i) must "follow in time" the completion of the underlying transaction and it had to be activity designed to *disguise or conceal* the origins of the proceeds.[12] *Edgmon,* 952 F.2d at 1214. For some purposes, the illegal drug sales here were completed when the seller and purchaser exchanged the drugs and the money. The seller of the drugs could have been convicted of distribution at the point of sale even though the proceeds were never returned to Pruneda. We do not intend to change that traditional sense of when a drug transaction between buyer and seller is complete. However, for purposes of the money laundering statute here being analyzed, the underlying drug transaction had not yet been completed and the money laundering activity had not yet begun.

A drug transaction, from a business perspective, consists of the distributor (or king-

---

11. A monetary instrument includes coin or currency of the United States. § 1956(c)(5).

12. We could envision scenarios where money laundering and the underlying illegal activity occur simultaneously. However, that is not this case.

pin) getting the drugs to his middlemen who in turn either sell the drugs directly or have others conduct the actual street sales. The middlemen then collect the money from either their sellers or the consumer (depending upon whether they conduct the sales themselves) and the middlemen then pay the distributor for the drugs that had been advanced to them.[13] It is not unusual for a middleman to use a courier to deliver the money to, and pick up the drugs from, the distributor.[14] During those transactions, it is not necessary for those involved to conceal or disguise the attributes of the money as it passes from one set of hands to another because the people expected to handle the money know it is illegal drug money.

■ In the instant case, the final part of the business deal consisted of transporting the money from Detroit, where the drugs had been sold, to California, so that Pruneda could pay his suppliers. The transportation of the money from Detroit to California in a box, suitcase, or other container does not convert the mere transportation of the money into money laundering. The existence of the money is, of course, concealed so that no explanation whatever need be offered to outsiders as to its attributes. The money laundering statute was designed to punish those drug dealers who thereafter take the additional step of attempting to legitimize their proceeds so that observers think their money is derived from legal enterprises. *Edgmon,* 952 F.2d at 1214; *Garcia–Emanuel,* 14 F.3d at 1474; *see also United States v. Johnson,* 971 F.2d 562, 569 (10th Cir.1992). That extra step is missing in this case with respect to the initial plan to transport the money to Pruneda.

■ The harder question is whether giving false exculpatory information to law enforcement officers in order to retrieve the allegedly confiscated money rises to the level of money laundering. Such conduct may satisfy the statutory elements of § 1956(a)(1)(B)(i) even though it may not be the kind of transaction that the statute was really intended to address. In any event, we need not address that issue in this case because, from the record before us on appeal, that effort appeared to be between Pruneda and Moore, and there is no evidence that it involved Dimeck.

The effort to retrieve the money from the DEA occurred after Dimeck had completed his role in transporting the money to Moore who was to deliver the money to Pruneda in California. The character and risks involved in an attempt to retrieve confiscated funds from the DEA are sufficiently distinct and different in magnitude from a conspiracy merely to transport illegal funds secretly back to Pruneda that on this record we cannot conclude that the retrieval efforts were merely a continuation of the initial conspiracy as to which Dimeck was a member. Rather, this record reveals that the initial conspiracy involving Dimeck came to an end when the DEA seized the drug proceeds. Later, Pruneda agreed with Moore to try to recover those funds from the DEA by deceit. However, there is no evidence in the record that Dimeck ever became a part of this effort.

■ As we said in *Evans,* "[t]he best way to assess a defendant's intended involvement in a conspiracy is to examine the conspiracy from that defendant's point of view. What exactly did [Dimeck] think [he] was joining? To answer this question, we need look only at common sense and to the facts of this case." *Evans,* 970 F.2d at 674. The government's own brief, at 21, describes the essential goals of the conspiracy as the transportation of marijuana proceeds. This is the conspiracy that Dimeck intended to join. The attempt by Pruneda to retrieve $60,000 of illegal drug proceeds after it was confiscated from the DEA, the very agency charged with gathering evidence against drug dealers, was beyond the scope of Dimeck's intended involvement when he joined the conspiracy.

13. Alternatively, a distributor could require that middlemen pay for the drugs in advance. That does not seem to have been the method of distribution in this case.

14. It is not clear from the record whether Dimeck was merely a courier or if he was a middleman who conducted his own sales. Moore and Salcido both performed the work of couriers in the instant transaction.

■ The only evidence argued by the government to link Dimeck to the attempt to retrieve the money from the DEA is evidence that Dimeck expressed concern that the confiscated box bore his business logo. We have already observed that Dimeck's concern that his logo was on the box is consistent with his part in the first conspiracy and does not link him to the second conspiracy. It is a natural expression of concern that he might be discovered for his role in the first conspiracy, but it has nothing to do with Pruneda's efforts to recover the funds from the DEA. The government also makes much of the fact that Dimeck knew the money had been confiscated and the government then makes an inferential leap that Dimeck also knew of the conspiracy to retrieve the money. However, the government does not point to any evidence in the record to support this inference. In any event, "[m]ere knowledge of illegal activity, even in conjunction with participation in a small part of the conspiracy, does not by itself establish that a person has joined in the grand conspiracy." *Id.* at 670. The government also asserts that Pruneda was in contact with "friends" in Detroit who could not locate any information regarding the confiscated money. However, as we previously stated, the government does not assert that there was any evidence that Dimeck was one of these "friends." "[W]e cannot sustain a conspiracy conviction if the evidence does no more than create a suspicion of guilt or amounts to a conviction resulting from piling inference on top of inference." *Id.* at 671 (quoting *United States v. Horn,* 946 F.2d 738, 741 (10th Cir.1991)). Thus, we find that there was not sufficient evidence for a reasonable jury to conclude that Dimeck was a member of the conspiracy to retrieve the money from the DEA.

Accordingly, we REVERSE the money laundering conviction of Dimeck, and REMAND to the district court to VACATE the judgment.