W. EUGENE DAVIS, Circuit Judge:
We took this case en banc to consider whether the government presented sufficient evidence at Cuellar’s trial to support his conviction of international money laundering under 18 U.S.C. § 1956(a)(2)(B)(i). For the reasons that follow, we conclude that the evidence was sufficient to prove all elements of the offense. We also consider Cuellar’s arguments that the district court erred in admitting the expert testimony of Agent Nuckles, which arguments were unnecessary for the panel to address under its disposition of the case. Finding no error, we affirm.
I.
On July 14, 2004, defendant Humberto Fidel Regalado Cuellar was stopped just south of Eldorado, Texas, about 114 miles from the Mexican border. Cuellar was traveling south in a Volkswagon Beetle toward Mexico on State Highway 77. Highway 77 runs toward Del Rio, Texas, which is directly across the border from Acuna, Mexico. He was pulled over by Deputy Kevin Herbert from the Schleicher County Sheriffs office, after Herbert observed the vehicle traveling very slowly, approximately 40 miles per hour in a 70 mile per hour zone. The car also swerved onto the shoulder, leading Herbert to suspect that the driver might be intoxicated. Because Cuellar spoke no English, Herbert called State Trooper Danny Nunez to assist him. As they waited for Nunez to arrive, Herbert attempted to determine whether Cuellar had insurance. Cuellar handed him written material from the glove compartment. He then exited the car, without being asked, and went to the front of the VW where the trunk was located and lifted the lid. Such behavior raises suspicion among law enforcement officers because it is considered a diversionary tactic used to draw attention away *285 from other locations in the vehicle where contraband is hidden.
In the papers Cuellar handed Herbert were bus tickets issued in Cuellar’s name. The tickets showed northbound travel the previous day, from Del Rio, Texas to San Antonio. They also showed a departure the same day from San Antonio to Big Spring, Texas. From there the tickets showed a departure to Lubbock, with a stop in Tulia, ending in Amarillo and then reversing course. Also among the papers were three Mexican permits to operate a vehicle without license plates. Two were in Cuellar’s name, dated April 17, 2004 and June 28, 2004. The third, dated May 18, 2004, was in the name of David Rodriguez Aleman. The papers also included a traffic ticket issued to Cuellar in Mexico on March 5, 2004.
Nunez arrived and began to talk to Cu-ellar. Nunez became suspicious of Cuellar because he was avoiding eye contact and seemed very nervous. Cuellar claimed he was on a three-day business trip attempting to buy vehicles, despite the fact that he had no luggage or extra clothing. Cuellar gave conflicting stories about his travels, saying first that he was coming from Acu-na, Mexico and later that he had been in San Angelo and was on his way to Acuna. Nunez noticed a bulge in Cuellar’s pocket, and when asked about it, Cuellar pulled out a wad of cash that smelled like marijuana to the officers. Nunez then requested that a drug search dog come to the scene.
While waiting for the canine unit, Nunez asked Cuellar for permission to search the vehicle. Cuellar consented. The officers started with the trunk that Cuellar had opened. Nunez noticed drill marks on the fender walls and evidence of tampering on the gas tank. Contraband is often transported in gas tanks and in secret compartments behind fender walls. Nunez considered the markings as evidence of possible modifications to facilitate transportation of contraband. He also noticed that mud appeared to be splashed purposefully on the car with an acoustic gun, which is done by criminals to cover up tool marks, fresh paint and other work done on a vehicle. In addition, while most of the car’s interior was faded and worn, the carpet appeared newer. Animal hair was found in the vehicle, concentrated in the rear area, but nowhere else in the car. Cuellar claimed that he had used the YW to transport goats on a prior occasion. Nunez doubted that goats could fit in the space.
Nunez also found a Whataburger bag with a receipt dated earlier the day of the stop. After calling the phone number on the receipt the officers determined that the restaurant was in Big Spring, which is northwest of San Angelo — farther north than Cuellar told officers he had traveled. A border patrol agent called to the scene checked Cuellar’s last border crossing date. That information was also inconsistent with Cuellar’s story. While Nunez was talking to Cuellar and searching the car, Nunez observed Cuellar standing on the side of the road and making the sign of the cross leading Nunez to believe that Cuellar knew he was in trouble.
Deputy Chatham arrived with the canine unit. The dog alerted on the money in Cuellar’s pocket and on the back floorboard area of the car. The officers found a hidden compartment underneath the floorboard containing $83,000 wrapped in duct tape bundles inside blue Walmart sacks and marked with a Sharpie as to the amounts in each bundle. A Sharpie was in the glove box of the car along with a Phillips-head screwdriver that matched the types of screws used in the hidden compartment. Chatham noticed that animal hair was concentrated in the area of the compartment. He testified that animal *286 hair is often used to try to distract a dog during a search but it does not work.
The officers arrested Cuellar and transported the car to the sheriffs office for farther investigation. At the station Cuel-lar wanted to call his family in Mexico and told Nunez that if he did not have the car in Mexico by midnight “his family would be floating down the river.”[1] As Cuellar was questioned, he gave several different versions of his travels, including the purpose of his trip, where he had been and when, and who owned the vehicle he was driving.
At trial, the government also offered testimony from Special Agent Richard Nucldes of U.S. Immigration and Customs, an expert on drug trafficking organizations. Nuckles testified that drug operations typically involve the flow of drugs from Mexico into the United States and the flow of cash proceeds of drug sales from the United States back into Mexico. He described the usual methods employed by drug traffickers in transporting drugs and money across the border. Cash is usually bundled. Duet tape and plastic are used to cover the odor of drugs and to prevent couriers from pilfering bills from the stash. Vehicles used to transport drugs and cash are sometimes registered in the driver’s name to avoid suspicion in the event of a traffic stop. Nuckles also indicated that couriers of drug proceeds would almost certainly know they were involved in illegal activity and were carrying money. Nuckles’ description of the typical drug courier was consistent with the facts concerning Cuellar. Nuckles did not testify regarding what customarily happens to the drug money in Mexico other than to say that it is returned to those in charge of the drug trafficking operation. Once in Mexico, which has a more cash-based economy than the U.S., the dollar can be used as readily as the peso.
Cuellar testified at his trial that he was in the business of buying and selling vehicles. He had purchased the Volkswagon Beetle in March and used it in his business. He also testified that he had carried small goats in the car. Cuellar said that he sold the car in May to a Mr. Morcia. Morcia could not get a permit for the car, so Cuellar obtained the permit in his own name in June 2004. Cuellar crossed the car into the United States and delivered it to Mr. Morcia and returned to Mexico.
Cuellar stated that he began a bus trip on July 13, 2004, to Amarillo, Texas to buy two trucks. He was only planning to be gone for two days so he carried no luggage. He arrived in Amarillo on July 14th, where a friend was waiting with the trucks. They began driving toward Acu-na, using one truck to tow the other. The two men stopped in Big Spring, but found no additional trucks at an acceptable price. When they arrived in San Angelo, Cuellar called Mr. Morcia to inquire about trucks for sale. Mr. Morcia showed them a truck and suggested that Cuellar buy the truck and tow the Volkswagon back to Mexico. The VW had a transmission problem that Cuellar was going to repair in Mexico, where needed parts were available. Cuel-lar did not want to buy the truck Mr. Morcia had shown him but offered to buy a truck he had seen in Big Spring if Mr. Morcia would loan him the necessary funds. Cuellar stated that Mr. Morcia lent him $1,600 to buy the other truck, which was part of the money he was carrying in his pocket.
*287 According to Cuellar, Mr. Morcia told him to deliver the Beetle to a certain shop in Acuna, run by Mr. Morcia’s brother-in-law. Cuellar drove the Beetle and his friend took the two trucks. Cuellar was unable to purchase the truck in Big Spring because the price was too high. After looking at other cars, Cuellar bought lunch at the Whataburger and then headed to Acuna. On the way to Acuna, the Beetle broke down and Cuellar could only drive it 18 miles per hour. Cuellar stopped in Eldorado to look at another vehicle but didn’t see the price. He was then stopped by the officers just outside of Eldorado. Cuellar said that he opened the hood of the car after being asked to do so. He denied knowing about the money and making the comment about his family floating down the river.
After all the evidence was presented, Cuellar moved for a judgment of acquittal alleging that the government had failed to prove all the elements of the offense, which was denied. The jury found him guilty. After trial, Cuellar filed a motion for judgment of acquittal, alleging that the government failed to prove the required elements of the offense. The district court denied the motion and sentenced Cuellar. Cuellar appeals.
A divided panel of this court concluded that the government’s evidence was insufficient to support Cuellar’s conviction on the issue of whether Cuellar’s transportation of the funds hidden in the VW was designed to conceal or disguise the nature, location, source, ownership or control of the proceeds and whether Cuellar knew that. We took this case en banc to reconsider that question. We also address the evidentiary issue raised by Cuellar relating to admissibility of the expert testimony of Agent Nuckles which the panel did not reach.
II.
Cuellar argues that the district court erred in denying his motion for judgment of acquittal because the facts outlined above are insufficient to sustain Cuel-lar’s conviction under 18 U.S.C. § 1956(a)(2). The denial of a motion for judgment of acquittal is reviewed de novo. United States v. Delgado, 256 F.3d 264, 273 (5th Cir.2001). The verdict will be affirmed if a reasonable trier of fact could conclude from the evidence that the elements of the offense were established beyond a reasonable doubt. Id. In assessing the sufficiency of the evidence, this court does not evaluate the weight of the evidence or the credibility of the witnesses but views the evidence in the light most favorable to the verdict, drawing all reasonable inferences to support the verdict. Id. at 273-74.
Cuellar was convicted of international money laundering in violation of 18 U.S.C. § 1956(a)(2). Section 1956 outlaws two types of money laundering. Subsection (a)(1) prohibits a person from knowingly engaging in a financial transaction involving illicit criminal proceeds knowing that the transaction is designed to conceal or disguise the nature, location, source, ownership or control of the illicit proceeds.[2] *288 Subsection (a)(2), the subsection Cuellar’s prosecution is brought under, does not require a transaction. Instead it prohibits a person from transporting (or attempting to transport) illicit funds, from a place inside the United States to a place outside the United States, knowing that such transportation is designed to conceal or disguise the nature, location, source, ownership or control of those proceeds.[3] Because both subsections of the statute contain identical language to describe the concealment element of the crimes, courts rely on cases under either subsection as controlling on the issue of concealment. United States v. Bieganowski, 313 F.3d 264, 279 (5th Cir.2002).
The plain language of the statute of conviction, 18 U.S.C. § 1956(a)(2)(B)(i), which outlaws international money laundering, requires the government to prove five distinct elements. First, it must show that the transportation or attempted transportation of funds was across U.S. borders. Second, the funds in question must be the proceeds of specified unlawful activity.[4] Third, the accused must know that the funds represent such proceeds. Fourth, the transportation of the funds must have been designed (in whole or in part) to conceal or disguise the nature, location, source, ownership or control of the proceeds. Fifth, the accused must know that such concealment was part of the transportation plan or design.
The panel unanimously found that the government’s proof was sufficient to establish the first three elements. On the first element (the international element), the government offered sufficient evidence that Cuellar was attempting to transport money into Mexico. He told the officers he was headed for Acuna and so testified at trial. Although he claimed he did not know the money was in the car, the jury was free to disbelieve this testimony, especially given the evidence of his guilty knowledge discussed in Section III.
On the second and third elements, the evidence was sufficient to allow a reasonable jury to infer that the money was proceeds of drug trafficking and that Cuel-lar knew that. The evidence of Cuellar’s guilty knowledge discussed in Section III was also probative on these elements. In addition, the money smelled of marijuana and was bundled in a way that is typical of drug trafficking. The jury was able to infer from the expert testimony regarding drug trafficking operations that Cuellar’s conduct was consistent with that of a typical drug money courier who knows what he is carrying. Based on this evidence, a reasonable trier of fact could have concluded that the money hidden in the car was *289 proceeds of drug trafficking and that Cuel-lar knew that.
The issue narrows to the fourth and fifth elements, whether the government produced sufficient evidence to allow the jury to find that the defendant was knowingly transporting the funds under a plan designed at least in part “to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds.” 18 U.S.C. § 1956(a)(2)(B)®. Cuellar argues that if all the government’s proof shows is that the money was hidden to allow it to be transported to Mexico, that is not enough to sustain a conviction. He reads the statutory prohibition against transportation that is designed in part to conceal the nature, location, source, ownership or control of the proceeds as requiring proof of a plan to conceal the funds once they reach the ultimate destination outside the country.[5] The plain words of the statute do not support this interpretation. The transportation of the funds to the border begins when they leave the owner’s hands and are delivered to the courier. The transportation ends when the funds arrive at the destination. Cuel-lar’s transportation plan or design includes the trip to Mexico as well as the disposition of the funds once they reach Mexico. So concealment of the funds during the U.S. leg of the trip is a vital part of the transportation design or plan to get the funds out of this country.
On several bases, we find that the government adequately established the concealment prong of the statute, i.e. that Cuellar’s transportation of the funds was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership or control of the proceeds. First, the evidence establishes that the transportation was designed to conceal the nature of the proceeds. The concealed cash, like the cash found on Cuellar’s person, had a strong enough odor of marijuana that the drug sniffing dog alerted on both. The smell identified it as proceeds associated with illicit drug activity. Several measures were taken in an effort to contain the odor of the drug tainted funds and conceal the nature of the hidden funds as drug proceeds during the transportation. The duct tape wrapped cash bundles were first covered in plastic bags and then covered by carpet. Goat hair was placed in the area of the concealed cash in an attempt to conceal the odor from a drug sniffing dog. In addition, because the packaging of the cash in duct tape and markings on the packages are consistent with methods used by drug traffickers without regard to the odor, placing the packaged cash in a hidden compartment also helped conceal the association of the money with an illegal enterprise. The jury could conclude that these aspects of the transportation were designed to conceal or disguise the nature of the cash as drug proceeds.
The evidence also supports a conclusion that the transportation was designed to conceal the location of the cash. Part of the transportation plan outlined above clearly was designed to contain the odor of the cash and hide the cash in a secret compartment during transport.
The government’s proof also establishes that the transportation was designed to conceal or disguise the source, ownership or control of the cash. Cuellar had very little information about the person, identified by Cuellar as Mr. Morcia, who was the owner of the cash. The transportation plan allowed the owner to put the cash in *290 the hands of an intermediary or third party, which made it difficult for authorities to determine who actually owned or controlled the cash. Agent Nuckles testified that drug dealers typically insulate themselves from others in the organization, such as couriers, to avoid revealing their identity.
Cuellar argues that a conviction under § 1956, which deals with money laundering, requires proof that the defendant’s acts created the appearance of legitimate wealth or converted dirty money into clean. The Second Circuit in United States v. Ness, 466 F.3d 79 (2d Cir.2006), expressly rejected this argument and the panel’s position on this issue. In Ness, the defendant received narcotics proceeds and remitted them to others connected with the same drug operation. Concealment was established by the use of “clandestine meetings to transfer large sums of concealed cash, the use of coded language, and the scrupulous avoidance of a paper trail.” Id. at 81. On this evidence, the Second Circuit found that “a jury could find that the acts of which Ness is accused were designed, at least in part, to conceal the identity of the funds.” Id. We agree. Although creating the appearance of legitimate wealth is one way of concealing illicit funds, it is not the only way concealment can be established.[6] This argument is inconsistent with the statutory language and with our case law. Congress chose the broad, unqualified word “conceal.” It makes no sense to say that Congress only intended to prohibit concealment that is accomplished in a certain way.
Two cases from this circuit hold that simply taking steps to hide illicit funds is sufficient to prove concealment. In United States v. Short, 181 F.3d 620 (5th Cir.1999), the defendant gave $25,000 in cash to his wife with instructions to put it in a safety deposit box in a relative’s name. The defendant’s conviction of money laundering was sustained even though nothing happened to the cash except the defendant removed it from his possession and tried to hide it. In United States v. Cihak, 137 F.3d 252 (5th Cir.1998), the defendant Bloch hurriedly transferred funds from his bank in the U.S. to banks out of the country after his co-conspirator was convicted of bank fraud. Concealment was found based on the timing of the transfers coincident with his co-defendant’s conviction and the defendant’s apparent hurry to liquidate his accounts and transfer them out of the country. The funds were not converted into other assets and were placed in accounts under the defendant’s name.
Cases in other circuits with facts more closely on point with this case support a conclusion that concealment was established in this case. In United States v. Carr, 25 F.3d 1194 (3d Cir.1994), the defendant’s conviction for international money laundering was affirmed on evidence that Carr transported cash in a carry-on bag for a flight to Colombia. When asked at the airport to declare any monetary instruments in excess of $10,000, he declared that he had only $4,000 in cash. A *291 search revealed $180,000 in cash hidden in a container in the bag and an additional $6,000 on his person. Carr told a highly suspicious, “if not incredible” story about the source and destination of the funds.[7]
Cuellar argues that the 10th Circuit opinion in United States v. Dimeck, 24 F.3d 1239 (10th Cir.1994), supports his argument that proof of concealment requires evidence that the defendant attempted to convert dirty money into clean money and that mere transportation of illegal funds from place to place is not the type of activity the statute is intended to target. Dimeck’s role in the drug transaction was to collect funds in Detroit that were due to the supplier and deliver the funds to the courier who in turn brought the funds to the supplier in California. Dimeck delivered the funds to the courier in an unsealed, untaped box, marked with the logo of Dimeck’s company. Dimeck suggested that the courier move the cash to another container, but the courier did not do so.
The 10th Circuit found that the evidence did not support a conviction because “delivery of the money did not result in the kind of transaction prohibited by 18 U.S.C. § 1956(a)(1)(B)©.” Id. at 1246. The funds were transferred to the supplier in a box marked with Dimeck’s company logo and were not transported in a manner designed to confuse or mislead anyone about the characteristics of the proceeds. The court also seemed to conclude that the underlying crime was not complete and the government failed to establish that funds were proceeds of illegal activity. The court observed that “The money laundering statute was designed to punish drug dealers who thereafter take the additional step of attempting to legitimize their proceeds so that observers think their money is derived from legal enterprises.” Id. at 1247.
Dimeck is distinguishable from today’s case on several bases. We read the primary holding of Dimeck to rest on the conclusion that the funds were not yet proceeds of a specified illegal activity, because the illegal activity, the drug sale, was not complete until the funds were delivered.[8] In addition, the facts of Dimeck do not display the effort to hide or conceal the “nature, the location, the source, the ownership, or the control” of the funds that the government established in Cuellar’s case. The participants in Dimeck simply transported the “illegal proceeds as illegal proceeds” with a minimal attempt at concealment. Id. at 1246.
In contrast, the record in today’s case reflects a number of facts a recent 11th Circuit opinion considered relevant in establishing the concealment prong of the money laundering statute. United States v. Johnson, 440 F.3d 1286 (11th Cir.2006), contains a thorough review of the types of activities that satisfy the concealment element under 18 U.S.C. § 1956(a)(1) and *292 (a)(2). From a review of the caselaw, the following were listed as evidence to consider in determining whether a transaction or transportation is designed to conceal:
Statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal funds in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves culminating in the transaction; or expert testimony on practices of criminals.
Id. at 1291. Another consideration the court found probative is whether the money is “better concealed or concealable after the transaction than before.” Id. After looking at the facts of several transactional money laundering cases, the court stated that they had in common “either numerous transfers, multiple accounts, or the use of third parties to effectuate concealment of the actual source of the money.” Id. at 1293.
Several of the activities listed above are present in this case. Cuellar made unbelievable and inconsistent explanations for his activities indicating an intent to conceal. The way the money was hidden within the vehicle demonstrates unusual secrecy surrounding the transportation of the funds. Expert testimony was presented about the practices of criminals transporting illegal proceeds to Mexico consistent with Cuellar’s transportation. In addition, Cuellar was a third party transporter used to effectuate concealment of the actual source and ownership of the money. Finally, given Mexico’s largely cash economy, if Cuellar had successfully transported the funds to Mexico without detection, the jury was entitled to find that the funds would have been better concealed or concealable after the transportation than before.
Under the facts as presented by the government, the evidence was more than sufficient to support Cuellar’s conviction of money laundering under 18 U.S.C. § 1956(a)(2).
III.
Cuellar’s remaining issue on appeal relates to the expert testimony of Special Agent Nuckles. Cuellar argues that the district court erred in allowing Nuckles to testify because the government failed to provide the defense with the disclosure required by Federal Rule of Criminal Procedure 16. Cuellar also contends that parts of Nuckles’ testimony constitute impermissible drug courier profiling and should have been excluded on that basis.
Shortly after Cuellar was arraigned, he filed a motion under Fed.R.Crim.P. 16(a)(1)(G) requesting a summary of the government’s opinion testimony. The district court granted the motion. A little over two weeks before trial, the government informed Cuellar of the government’s intent to introduce expert testimony from Richard Nuckles, an Immigration and Customs Enforcement Agent. The letter stated that his testimony would concern background information regarding drug smuggling operations and methods used to transport drugs and money into and out of the United States. Fed. R. Crim. P. 16(a)(1)(G) requires the government to provide upon request a written summary of expert testimony that the government intends to use in its case in chief, including “the witness’s opinions, the bases and reasons for those opinions, and the witness’s qualification.” The government’s disclosure did not fully comply with the rule. Cuellar argues that the district court reversibly erred by denying his motion to exclude Nuckles’ testimony.
*293 This court reviews a district court’s rulings on discovery violations for abuse of discretion. United States v. Doucette, 979 F.2d 1042, 1044-45 (5th Cir.1992). A violation of Rule 16 does not necessitate exclusion of the testimony. Rule 16(d)(2) states that the court “may,” but is not required, to impose sanctions. If the district court elects to admit the evidence without sanctions, a new trial must be ordered based on alleged discovery error only when a defendant demonstrates prejudice to his substantial rights. Doucette at 1044-45. See also Fed. R.Crim.P. 52(a).[9] Cuellar raises two sources of prejudice, surprise and the admission of drug profile testimony.
The type of expert testimony offered by Officer Nuckles has become almost routine in drug cases where interpretation of the defendant’s actions or other evidence would be helpful to the jury. United States v. Ortega, 150 F.3d 937, 943 (8th Cir.1998). In this circuit, “the rule is well-established that an experienced narcotics agent may testify about the significance of certain conduct or methods of operation unique to the drug distribution business, as such testimony often is helpful in assisting the trier of fact understand the evidence.” United States v. Washington, 44 F.3d 1271, 1283 (5th Cir.1995). Such opinions, unlike technical or scientific expert opinions, are not complex, so less extensive disclosure may adequately advise the defense of the nature of the testimony and allow them to prepare for cross-examination. United States v. Jackson, 51 F.3d 646, 651 (7th Cir.1995).
Although Cuellar has demonstrated a violation of Rule 16(a)(1)(G) because the government’s disclosure regarding Nuck-les’ testimony was incomplete, he has not shown that the violation prejudiced his substantial rights. The principal violation of Rule 16 arises from the failure to provide Nuckles’ qualifications and the basis for his testimony on a timely basis. Cuel-lar does not claim prejudice related to the information that was lacking in the notice the government did provide or argue that it would have provided additional grounds for cross-examination. The disclosure, while lacking in detail, did reveal in general terms the nature of Agent Nuckles’ testimony. The record of counsel’s cross examination of Nuckles shows likely familiarity with testimony of this nature which is frequently used by the government in the prosecution of cases of this nature. See United States v. Washington, 44 F.3d at 1283, n. 45 and cases cited therein. Cuellar did not directly attack Nuckles’ testimony about the manner in which drug smuggling operations are conducted. However, he did effectively cross-examine Nuckles and elicited testimony that tended to undermine the government’s point that Cuellar was transporting the proceeds of a drug transaction. Nuckles conceded on cross-examination that a variety of illicit and legal enterprises could have a need to transport United States currency to Mexico and also testified that United States currency can be useful in obtaining permits and other items of value needed to do business in Mexico.
*294 The purpose of Rule 16(a)(1)(G) is “to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert’s testimony through focused cross-examination.” Fed. R. Crim. P. 16 Advisory Committee Notes to 1993 amendment. Although the notice provided by the government did not contain all the detail required by the rule, it did notify Cuellar of the fact that the government intended to call Agent Nuck-les as an expert witness and the subject of his expected testimony. The purposes of Rule 16 were not frustrated. Cuellar has not shown that the violation of the discovery order by the government necessitated the exclusion of Nuckles’ testimony, the “most extreme sanction possible.” United States v. Bentley, 875 F.2d 1114, 1118-19 (5th Cir.1989). Neither has he demonstrated that his substantial rights were prejudiced by any surprise resulting from the discovery violation. Doucette, 979 F.2d at 1044-45; United States v. Smith, 354 F.3d 390, 397 (5th Cir.2003).
Cuellar also argues the district court erred in allowing Nuckles to provide drug courier profile testimony. Cuellar specifically references the following testimony, which occurred during the government’s direct examination of Nuckles:
Q: Does a drug smuggler give his marijuana or his money to be transported to someone who doesn’t know what they are transporting?
A: Not in my experience. The people who are driving money or who are driving dope know that they are transporting either dope or money, something of value. They may not know that— whether they are marijuana or cocaine. They may not know how much money they have, but they know they are transporting it.
Although Cuellar objected to the admission of Nuckles’ testimony generally as a violation of Rule 16, Cuellar did not object to the above testimony as improper drug-courier profile testimony.
An appellant must raise an objection to the admission of evidence at trial such that the issue is presented to the district court with sufficient specificity. Rule 103(a)(1) F.R.E.; United States v. Maldonado, 42 F.3d 906, 910 (5th Cir.1995). Cuellar’s failure to raise the issue at trial results in plain error review. Id. at 912. Under that standard, we do not correct an error raised for the first time on appeal unless there is (1) error, (2) that is plain, and (3) that affects substantial rights. United States v. Olano, 507 U.S. 725, 731-37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). If these factors are established, the decision to correct the forfeited error is within the court’s sound discretion, which will not be exercised unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id. at 736,113 S.Ct. 1770.
We have previously disapproved of the use of an expert’s drug courier profile evidence as a substitute for substantive evidence of a defendant’s guilt and we repeat that disapproval today. A drug-courier profile is “nothing more than a compilation of characteristics which aid law enforcement officials in identifying persons who might be trafficking in illegal narcotics.” United States v. Williams, 957 F.2d 1238, 1242 (5th Cir.1992). Drug-courier profiles “have long been recognized as inherently prejudicial because of the potential they have for including innocent citizens as profiled drug couriers” and therefore are not admissible as substantive evidence of the defendant’s guilt. Id. (internal quotation marks omitted.).
*295 In United States v. Gutierrez-Farias, 294 F.3d 657 (5th Cir.2002), this court held that it was error to admit expert testimony that “crosses the borderline ... between a mere explanation of the expert’s analysis of the facts and a forbidden opinion on the ultimate legal issue in the case. The clear suggestion of [the agent’s] testimony is that, because most drivers know there are drugs in their vehicles, Gutierrez must have known too.” Id. at 663 (internal quotations and citations omitted). Similarly in United States v. Ramirez-Velasquez, 322 F.3d 868 (5th Cir.2003), where the agent testified that drug organizations seek trustworthy drivers because their cargo is valuable and uninsurable, this court determined that the admission of such testimony was obvious error because the agent “made the generalization, albeit not quite directly, that drivers know they are carrying drugs.” Id. at 878-79 & n. 12.
Nuckles’ testimony that “[t]he people who are driving money or who are driving dope know they are transporting either dope or money, something of value,” is indistinguishable from the testimony held erroneously admitted in Gutierrez-Farias and Ramirez-Velasquez. Id. at 879. Cu-ellar has thus established an error that is obvious, thereby satisfying the first two prongs of the plain error standard. However, Cuellar also bears “the burden of demonstrating that the error affected his substantial rights, i.e. affected the outcome of the proceedings.” Id.
Cuellar cannot sustain that burden. As set forth above in the description of the evidence presented at trial, the jury heard ample evidence of Cuellar’s guilty knowledge. Cuellar was carrying a large sum of cash on his person that smelled noticeably of marijuana. He was nervous when stopped by officers on the highway and made numerous inconsistent false and implausible statements about his travels. He attempted to focus the officers’ attention on the trunk of the car and away from the secret compartment where the money was hidden. Once he was arrested and brought in for further questioning he told officers that if he did not have the car in Acuna by midnight his family would be floating down the river. This evidence provided a firm basis for the jury to find that Cuellar knew he was transporting funds that represented the proceeds of illegal activity. Because Cuellar has not demonstrated that his substantial rights were affected by the admission of improper drug-courier profile testimony, he has not shown plain error. See Ramirez-Velasquez, 322 F.3d at 879.
rv.
For the foregoing reasons, Cuellar’s conviction is affirmed.
AFFIRMED.

. When Cuellar made this statement he did not know the officers had discovered the cash in the hidden compartment.

. That subsection reads as follows:
(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
(B) knowing that the transaction is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity ...
shall be sentenced ...

. That subsection reads as follows:
(a)(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States to or through a place outside the United States
(B) knowing that the monetary instrument or funds involved in the transportation represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity ...
shall be sentenced ...

. In contrast, the money smuggling statute, 31 U.S.C. § 5332, outlaws the unreported transportation of large sums of money outside the country whether they are legitimate funds or illicit funds. In passing that legislation, Congress found that transporting money across the border may be the most common form of money laundering. 31 U.S.C. § 5332, Congressional Findings and Purpose.

. The dissent makes a similar argument by asserting that the statute does not prohibit "concealing something to transport it,” but only prohibits "transporting something to conceal it.”

. The phrase "create the appearance of legitimate wealth” appears to have first appeared in a statement of purpose of money laundering by the Department of the Treasury. As quoted in United States v. Garcia-Emanuel, 14 F.3d 1469, 1474 (10th Cir.1994), the purpose is "concealing the illicit sources of their monies by creating the appearance of legitimate wealth.” Garcia-Emanuel quotes a similar description by the President’s Commission on Organized Crime. The commission "described money laundering as schemes designed to assist criminals who 'seek to change large amounts of cash ... into ostensibly legitimate form, such a business profits or loans, before using those funds for personal benefit ...'” Id.

. See also United States v. Hurtado, 38 Fed.Appx. 661 (2d Cir.2002). Hurtado with others was stopped crossing the border into Canada. A search of her van revealed several pieces of luggage containing $540,000. Drug dogs alerted to two of the bags. Customs agents testified regarding methods used by drug cartels to use couriers to exchange large quantities of drugs for cash, the packing of the money (which matched the packaging in the van), and that cash was commonly placed in bags that had previously held the drugs explaining why the drug dogs would alert on bags containing cash. Hurtado lied about her employment and had no legitimate explanation for the source of the cash or its destination. Her conviction for international money laundering under § 1956(a)(2) was affirmed.

. We question the conclusion that the funds making up the payment are not themselves proceeds of illegal activity because they presumably were generated by sales of the drugs to end users or other distributors.

. The Doucette test provides the proper standard of review for deciding whether the error claimed by Cuellar requires reversal of his conviction. See also Fed.R.Crim.P. 52(a). The dissent is correct that the test laid out in United States v. Sarcinelli, 667 F.2d 5, 6-7 (5th Cir. Unit B 1982), provides the district court with the framework for evaluating whether to impose a sanction for a Rule 16 violation and for this court to evaluate the propriety of the sanction imposed. See also United States v. Katz, 178 F.3d 368, 371 (5th Cir.1999), and United States v. Bentley, 875 F.2d 1114, 1118 (5th Cir.1989). Reversal requires a showing that the refusal to impose a sanction prejudiced the defendant.